UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID ALAN MITCHELL,

Plaintiff,

v.

DWAINE SALISBURY,

Defendant.

_____/

Case No. 16-cv-10567

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
R. STEVEN WHALEN

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT [27]**

**I. INTRODUCTION**

On February 16, 2016, David Mitchell ("Plaintiff" or "Mitchell") commenced this action against the City of Warren and six City of Warren police officers (collectively, "Defendants"). Dkt. No. 1, pp. 1–2 (Pg. ID No. 1–2). Plaintiff filed his First Amended Complaint and alleging two counts (an excessive force claim and a warrantless search and seizure claim) against only Defendant Dwaine Salisbury. Dkt. No. 22.

The matter is presently before the Court on Defendant's Motion for Summary Judgment on January 10, 2017. Dkt. No. 27. On March 22, 2017, the Court conducted a hearing on the motion and heard oral arguments from counsel.

-1-

For the reasons discussed herein, the Court **DENIES** Defendant's Motion for Summary Judgment [27].

## II. BACKGROUND

On February 25, 2014, Plaintiff was driving in the City of Warren when he was pulled over for swerving at 6:41 p.m. Dkt. No. 29-4, p. 2 (Pg. ID 617). Officer Zayto found an open can of Miller High Life beer near the center console and issued Plaintiff a citation for open intoxicant in a vehicle. *Id*. Plaintiff did not contest the ticket and paid it by mail so that he would not need to appear in court. Dkt. No. 29-2, p. 27 (Pg. ID 590). Plaintiff's vehicle was impounded following the issuance of the citation. *Id*. at 14 (Pg. ID 577).

Plaintiff then walked over to his friend Eddie Bush's ("Bush") house, where the two embarked on a trip to a liquor store to buy more beer. *Id*. The men noted prior to their departure that the vehicle Bush was driving had malfunctioning front headlight. *Id*. After the men departed the liquor store, Bush noticed a police vehicle following the car. *Id*. Rather than stopping immediately once the police car's lights went on, Bush continued driving until he got to his driveway. *Id*. at 14–15 (Pg. ID 577–78). Defendant Salisbury states that the reason for the stop was that both lights illuminating the license plate were burned out, making the license plate unreadable. Dkt. No. 29-3, p. 8 (Pg. ID 603); Dkt. No. 29-6, p. 11 (Pg. ID 640).

When Defendant asked Bush for his driver's license, registration, and proof of insurance, Bush stated that he did not have the materials and was driving on a suspended license. Dkt. No. 29-6, p. 6 (Pg. ID 635). Bush was ordered to exit the vehicle. *Id*. While he was being searched, Bush threw a bag of crack cocaine he was holding and pushed officers away. *Id*. Defendant was unable to maintain his grip on Bush due to the icy and slippery conditions, and Bush fled on foot. *Id*. Plaintiff said it appeared that Bush "clothes lined or shoved" the officers, prior to fleeing. Dkt. No. 29-2, p. 15 (Pg. ID 578). Officers apprehended Bush, handcuffed him, and escorted him back to the vehicle. Dkt. No. 29-3, p. 12 (Pg. ID 607).

Defendant ordered Plaintiff to exit Bush's vehicle so that it could be searched prior to being towed and impounded. Dkt. No. 29-3, p. 19 (Pg. ID 614). Plaintiff was compliant the entire time. *Id*. at 13 (Pg. ID 608). Defendant searched Plaintiff because there had been narcotics in the vehicle, and recalls that Plaintiff consented to the search. *Id*. at 19 (Pg. ID 614). Plaintiff states that Defendant performed a pat-down search on him and then had him wait in the back seat of the vehicle. Dkt. No. 29-2, pp. 18–19 (Pg. ID 581–82). Plaintiff asked if he was under arrest three times and each time, he claims Defendant responded, "You're coming with me." *Id*. at 19 (Pg. ID 582). Defendant recalls telling Plaintiff that he was not under arrest, and that Plaintiff could be on his way as soon as Defendant ran his name to check for warrants. Dkt. 29-3, p. 13 (Pg. ID 608).

-3-

After Plaintiff's name came up clean, Defendant had Plaintiff walk down the driveway to wait in the police vehicle while an inventory search was performed on Bush's car. *Id*. Defendant testified that the two men walked freely, side by side, down the driveway's slippery incline. *Id*. Plaintiff recalls that Defendant had grabbed ahold of his coat and pulled him to the police vehicle. Dkt. No. 29-2, p. 19 (Pg. ID 582). Both men remember struggling to maintain their balance while walking on the slick ice, but Plaintiff does not believe Defendant slipped to the same extent that he did. *Id*. ("I was trying not to lose my balance and footing."); Dkt. No. 29-3, pp. 13–14 (Pg. ID 608–09) ("It was a chore just to keep our balance, both of us were slipping pretty good."). Plaintiff slipped and fell on the ice, and he attributes this fall to Defendant pulling him across the slippery surface faster than he would have ordinarily walked. Dkt. No. 29-2, p. 19, 29 (Pg. ID 582, 592) ("The officer yanked back and forth on me like you would escort someone to load them into a vehicle. When he yanked back, my feet went out and as he yanked down I was on my way to the ground already."). As a result of the fall, Plaintiff fractured his wrist. *Id*. at 17 (Pg. ID 580).

While both Defendant and Plaintiff agree that the driveway and road area were covered by a sheet of ice and extremely slippery, their recollections diverge more substantially at the point after which Plaintiff fell and broke his wrist. *See*

Dkt. No. 29-2, p. 19 (Pg. ID 582) (including an estimate by Plaintiff that the ice on the sloped driveway was ten inches thick).

While Plaintiff was on the ground, he believes that Defendant slammed a knee into his back, pinning him down while Defendant looked for drugs he suspected Plaintiff threw under the police vehicle. *Id*. Plaintiff later stated, however, that he was uncertain if Defendant intentionally fell on Plaintiff's back, or if Defendant had slipped and accidentally fell on him. Dkt. No. 29-2, p. 20 (Pg. ID 583). Plaintiff states that Defendant then attempted to pick him up and help him into the police vehicle, but slipped and fell on the ice, dropping both of them. Dkt. No. 29-2, p. 17 (Pg. ID 580). On his second try, Plaintiff recalls that Defendant successfully picked him up and pulled him into the vehicle. *Id*. Once inside the vehicle, Plaintiff states that Defendant kneed him in the buttocks, launching him across the backseat and "bust[ing his] head open on the arm rest." *Id*.

Defendant alleges that Plaintiff got stuck under the police vehicle after he slipped on the ice and broke his wrist. Dkt. No. 29-3, p. 14 (Pg. ID 609). Defendant recalls trying to pull Plaintiff out from under the vehicle, asking Plaintiff to help push himself out, until Plaintiff was finally dislodged. *Id*. at 15 (Pg. ID 610). Defendant states that Plaintiff then sat in the seat of the police vehicle and complained of arm pain for the next ten minutes, until Defendant's partner returned. *Id*.

Plaintiff did not request an ambulance. Dkt. No. 29-2, p. 21 (Pg. ID 584) ("There was no need for an ambulance."). Defendant stated that Plaintiff declined his offer to call for an ambulance because he did not have insurance. Dkt. No. 29-3, p. 19 (Pg. ID 614). Defendant drove Plaintiff to St. John Macomb Hospital and dropped him off. Dkt. No. 29-2, p. 20 (Pg. ID 583). The hospital physician informed Plaintiff that he would need an orthopedic surgeon to set his wrist, due to the nature of the fracture. *Id.* at 21 (Pg. ID 584); Dkt. No. 29-10, p. 21 (Pg. ID 680). Plaintiff was prescribed Tylenol with Codeine, given a splint and sling, and released. Dkt. No. 27-5, pp. 7, 12 (Pg. ID 504, 509).

Plaintiff did not have insurance to pay for an orthopedic surgeon, so he called the Warren police station to get them to pay for his treatment. Dkt. No. 29-2, p. 22 (Pg. ID 585). He did not file any complaints against the officers involved and declined to meet with the commanding officer because he had decided to sue. *Id.*

Plaintiff visited the emergency room at St. Joseph's hospital a few days later on March 2, 2014. Dkt. No. 29-11. St. Joseph's physicians confirmed that Plaintiff had a wrist fracture, placed his wrist in another splint, recommended Plaintiff see an orthopedic surgeon, and discharged him. *Id.* at 8 (Pg. ID 700). Plaintiff saw a physician at Community Orthopedic Surgery on March 4, 2014, who applied a cast. Dkt. No. 29-12, p. 4 (Pg. ID 739). Plaintiff did not have his wrist re-broken and set with pins because he did not have insurance to pay for the procedure.

Plaintiff alleges that he now only has half strength in his wrist and deals with constant pain. Dkt. No. 29-2, p. 31 (Pg. ID 594). He also alleges loss of income because he believes the Social Security Administration denied his disability application due to this incident. *Id.* at 23 (Pg. ID 586).

### III. LEGAL STANDARD

**A.    Federal Rule of Civil Procedure 56**

Federal Rule of Civil Procedure 56(c) "directs that summary judgment shall be granted if 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 779 (6th Cir. 1998). The Court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, the Court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## IV. DISCUSSION

In his Complaint, Mitchell asserts two claims against Defendant: (1) that Defendant violated his Fourth Amendment rights by using excessive force against him; (2) that Defendant violated his Fourth Amendment rights by searching and seizing him without a warrant or probable cause. Dkt. No. 22.

Defendant seeks summary judgment on Plaintiff's Complaint, arguing (1) that Plaintiff fell as a result of hazardous, icy conditions rather than excessive force; (2) that Defendant was allowed to detain and search Plaintiff based on reasonable suspicion; and (3) that Defendant is entitled to qualified immunity. Dkt. No. 27, p. 8 (Pg. ID 282).

### A.      Count I: Excessive Force

In Count I, Plaintiff asserts a claim for excessive force under § 1983 stemming from a violation of the Fourth and Fourteenth Amendments to the United States Constitution. Dkt. No. 22, pp. 5–6 (Pg. ID 240–41). Specifically, Plaintiff claims that Defendant "repeatedly push[ed] and pull[ed]" him, causing him to fall on the ground. *Id.* at 4 (Pg. ID 239). Plaintiff later disputed his complaint's allegation that Defendant pushed him during the course of his deposition. Dkt. No. 29-2, p. 29 (Pg. ID 592) ("he wasn't pushing me around or I would have fallen long before I made it to the police car.").

A seizure must occur before an excessive force claim is cognizable under the Fourth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833, 844–45 (1998). A seizure within the meaning of the Fourth Amendment "requires an intentional acquisition of physical control," *Brower v. Inyo County*, 489 U.S. 593, 596 (1989), and "only when there is a governmental termination of freedom of movement *through means intentionally applied*" is the Fourth Amendment implicated. *Id*. at 597. "In sum, the Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." *Id*. at 596 (internal citation omitted).

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *See Graham v. Connor*, 490 U.S. 386, 394 (1989). When performing a "reasonableness inquiry" in an excessive force case, the Court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397. This objective inquiry judges the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene, in light of the facts and circumstances surrounding him or her. *Id*. at 396–97. The reasonableness inquiry cannot be made by evaluating a specific officer's

underlying intent or motivation, or by utilizing the 20/20 vision of hindsight. *Id*.

"With respect to a claim of excessive force, the same standard of reasonableness at

the moment applies: 'Not every push or shove, even if it may later seem

unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."

*Id*. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

In applying the objective reasonableness test, the court is required to pay

careful attention to the facts and circumstances of each particular case, including

(1) the severity of the crime at issue, (2) whether the suspect poses an immediate

threat to the safety of the officers or others, and (3) whether he is actively resisting

arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

While Bush allegedly committed a number of serious offenses, including

possession of crack cocaine and striking the officers before fleeing on foot,

Plaintiff was merely present and was not suspected of any independent offense.

Dkt. No. 29-3, p. 13 (Pg. ID 608) ("He stepped out, I explained to him that Mr.

Bush had crack cocaine on him, he was inside the vehicle. I was going to search

him. He complied."). Accordingly, there does not appear to be a factual dispute

that Plaintiff was not suspected of a severe offense. Furthermore, Defendant

testified that Plaintiff was totally compliant the whole time. *Id*. There is no factual

dispute that Plaintiff did not resist or evade the officers.

Finally, no evidence has been presented that suggests Plaintiff posed an immediate threat to the safety of the officers or others. There is no evidence that Defendant thought Plaintiff was armed or had seen him make any furtive movements in Bush's vehicle prior to stepping out. Thus, none of the factors in the objective reasonableness test justify the use of force against Plaintiff.

Plaintiff alleges three types of force were used against him: (1) he alleges that Defendant grabbed him and pulled him across the ice, causing him to fall and break his wrist; (2) he claims that Defendant placed a knee in his back after he fell;[1] and (3) he asserts that Defendant kneed him in the buttocks after he climbed into the police vehicle. Taking the evidence in the light most favorable to the non-moving party, there is a question of fact as to whether the force alleged by Plaintiff was excessive.

---

[1] Plaintiff also acknowledges that the knee in his back may have been the result of Defendant slipping and accidentally falling on him, rather than an intentional act. Dkt. No. 29-2, p. 20 (Pg. ID 583) ("My face was down into the ravine of the track. I don't know if the officer slipped and fell with his knee into my back on purpose, or if he did it to look under the vehicle for drugs, or if he did it in the middle of a slip or a fall. He was above me and my eyes were at the ground."). Were a trier of fact to find that Defendant accidentally fell on Plaintiff's back, this physical contact could not give rise to an excessive force claim. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015) ("And we have limited liability for excessive force to situations in which the use of force was the result of an *intentional and knowing act* (though we leave open the possibility of including a 'reckless' act as well)." (emphasis added)).

-11-

**B.     Count II: Unlawful Search and Seizure**

In Count II, Plaintiff claims that his Fourth Amendment rights were violated when Defendant Salisbury (1) "seized/detained Plaintiff without probable cause or exigent circumstances"; (2) "search[ed] Plaintiff and arrest[ed] him by restricting his freedom to freely move"; and (3) "falsely arrested/detained/seized Plaintiff." Dkt. No. 22, p. 7 (Pg. ID 242).

Plaintiff's initial detention during the stop of Bush's vehicle was constitutionally permissible under the facts presented. Defendant had a lawful reason to stop the vehicle driven by Bush, because the vehicle's registration lamps were broken. Dkt. No. 29-6, p. 11 (Pg. ID 640); *see United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007) (stating that "police may make a stop when they have probable cause to believe a civil traffic violation has occurred"); MICH. COMP. LAWS § 257.683(1) ("A person shall not drive . . . a vehicle ... [that] is not at all times equipped with lamps and other equipment in proper condition . . . ."). Additionally, Defendant was permitted to impound Bush's car after arresting Bush. Dkt. No. 29-6, p. 4 (Pg. ID 633); *see People v. Toohey*, 438 Mich. 265, 279–80, 475 N.W.2d 16, 23 (1991) (finding that "courts need not second-guess a police officer's exercise of professional judgment regarding impoundment of an automobile when the judgment was exercised in accordance with otherwise reasonable police department regulations").

By his own admission, Plaintiff waited voluntarily in Bush's vehicle after Bush fled on foot. Dkt. No. 29-2, p. 16 (Pg. ID 579). Defendant was shocked to find Plaintiff still waiting in the passenger seat when he returned from apprehending Bush. Dkt. No. 29-3, p. 12 (Pg. ID 607). Accordingly, Plaintiff's choice to remain in the car during the chase cannot constitute an impermissible seizure.

Furthermore, the Sixth Circuit has stated that passengers are necessarily required to exit vehicles subject to inventory search prior to impoundment. *United States v. Bah*, 794 F.3d 617, 627 (6th Cir.), *cert. denied sub nom. Harvey v. United States*, 136 S. Ct. 561 (2015). Since Bush's car could not be impounded while Plaintiff remained inside of it, it was lawful for Defendant to order Plaintiff to step out of Bush's vehicle. Thus, up until this point in the traffic stop, Plaintiff does not have a legally valid claim that his Fourth Amendment rights were violated by an unlawful seizure.

After Plaintiff exited the vehicle, Defendant argues that his frisk of Plaintiff's person and search of Plaintiff's identification was constitutionally permissible because he needed to identify Plaintiff and investigate if Plaintiff was involved in Bush's crimes, and because Defendant needed to make sure Plaintiff was not armed. Dkt. No. 27, p. 19 (Pg. ID No. 293).

-13-

**1. Reasonable Suspicion to Perform a Pat Down**

The Court will first address Defendant's second argument: that frisking Plaintiff was necessary for Defendant's safety. "A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop, . . . and conducting pat-down searches upon reasonable suspicion that they may be armed and dangerous." *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005)). However, an officer is only allowed to pat-down a person in performing a *Terry* stop if he can "point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron v. New York*, 392 U.S. 40, 64 (1968) (holding search for drugs required more than reasonable suspicion).

Defendant did not testify that he believed Plaintiff to be armed or dangerous, or that Plaintiff made any furtive movements during the stop that led him to suspect Plaintiff might have a weapon. *See United States v. Noble*, 762 F.3d 509, 521 (6th Cir. 2014) (stating officers may "perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous."). Accordingly, since Defendant has not produced particular facts from which he reasonably inferred that Plaintiff was armed and dangerous, there were no grounds for frisking Plaintiff.

-14-

## 2. Probable Cause to Support a Search for Drugs

Next, the Court will address Defendant's first argument, that searching Plaintiff was necessary to identify Plaintiff and investigate whether Plaintiff was involved in Bush's crimes.[2] Dkt. No. 27, p. 19 (Pg. ID No. 293). The crimes Bush was arrested on were (1) possession of crack cocaine; (2) resisting an officer; (3) driving with a suspended license; and (4) having an arrest warrant pending in other jurisdictions. Dkt. No. 27-2, p. 4 (Pg. ID 303). Accordingly, based on the facts provided, the only conceivable crime that Plaintiff could have been involved in was Bush's drug crime.

As the Court found above, because there was no valid *Terry* search, the search was valid only if the officer had probable cause to believe that Plaintiff had drugs at the time of the search. *See United States v. Moore*, 390 F. App'x 503, 506

_____

[2] The Court previously stated in its order on Defendants' Motion to Dismiss that reasonable suspicion was needed to search Plaintiff. *See* Dkt. No. 20, p. 11 (Pg. ID 223). This imprecisely worded statement was in the context of frisking a passenger for weapons upon reasonable suspicion that he is armed and dangerous. *See id.* The word "search" was meant to imply a search of the outer layers of the Plaintiff's clothing for weapons, commonly known as a frisk. *See id.* Now that Defendant presents an argument that he was not merely patting down Plaintiff, but also searching Plaintiff for evidence connected with Bush's crimes, the Court clarifies that reasonable suspicion would not have been sufficient for searches extending outside of a basic pat down for officer safety. Both Plaintiff and Defendant have testified that a basic pat down search occurred. *See* Dkt. No. 29-2, p. 18 (Pg. ID 581) ("Q: Okay. Basic pat down search? A: I believe so."); Dkt. No. 29-3, p. 13 (Pg. ID 608) ("Q: Okay. So he puts both hands on top of the car, you pat him down? A: Don't find anything substantial nothing.").

(6th Cir. 2010). "For probable cause to exist, the facts and circumstances within the officers' knowledge must be sufficient to warrant a man of reasonable caution to believe that an offense had been, was being, or was about to be committed." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007). "Whether probable cause exists depends on the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *United States v. Pearce*, 531 F.3d 374, 380–81 (6th Cir. 2008) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)).

It has been established that "mere propinquity to others independently suspected of criminal activity does not, without more, support a *Terry* stop or a seizure." *Family Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 605 (6th Cir. 2015) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91–93 (1979)). Although "a car passenger—unlike the unwitting tavern patron in *Ybarra*—will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing," *Wyoming v. Houghton*, 526 U.S. 295, 304–05 (1999), the longstanding rule is that "probable cause to search a car does not mean that 'a person, by mere presence in a suspected car, loses immunities from search of his person to which he would otherwise be entitled.' " *Moore*, 390 F. App'x at 507 (quoting *United States v. Di Re*, 332 U.S. 581, 587, (1948)).

In the present case, no evidence in the record suggests that Plaintiff was involved in Bush's drug offense. Defendant's testimony at the deposition indicates

that he had no specific suspicion of Plaintiff. Defendant stopped Bush's vehicle because of a registration lamp violation, and thereafter found Bush was driving on a suspended license and possessed crack cocaine. No evidence before Defendant tied Plaintiff to Bush's drugs, and search of the vehicle was lawful because it was an inventory search prior to towing. There is a dispute of fact as to whether Defendant received consent to search Plaintiff's person. Based on the facts before the Court, Defendant did not have the probable cause necessary to overcome the "the unique, significantly heightened protection afforded against searches of one's person." *Moore*, 390 F. App'x 503, 507 (quoting *Houghton*, 526 U.S. at 301).

### 3. False Arrest or Detention

In his Amended Complaint, Plaintiff alleges that Defendant "falsely arrested/detained/seized" him. However, on summary judgment, Plaintiff has presented no evidence that he was arrested during the incident. His response brief makes no argument concerning false arrest and does not allege that Plaintiff was ever handcuffed or informed he was under arrest. Accordingly, it appears that Plaintiff has conceded that no false arrest took place.

In support of his unlawful seizure claim, Plaintiff cites to the dissent in *United States v. Rodriguez*, 485 Fed. App'x. 16, 21 (6th Cir. 2012) and frames the dissent as the majority's holding. Dkt. No. 29, pp. 19–20 ("In *United States v. Rodriguez*, 485 Fed. Appx. 16, 21 (6th Cir. 2012), the Court held that an officer's

-17-

words alone are sufficient to make a reasonable person feel that they are not free to walk away. In that case, the court found that defendant officer's statement of 'So let me ask you something,' after previously telling the plaintiff that he was 'good to go,' was enough to constitute a seizure. *Id* at 21."). The majority in *Rodriguez* actually "conclude[d] that no seizure took place, and therefore there was no need for [the officer] to have reasonable and articulable suspicion to ask additional questions after the purpose of the traffic stop was complete." 485 F. App'x at 19 (where the officer stated, "Let me ask you something" in a non-threatening manner and proceeded to question the defendant for four minutes in the back of the police cruiser after telling the defendant he was "good to go").

While officers may compel individuals to give their names in the course of a valid *Terry* stop, *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 187–88 (2004), an individual is free to refuse to answer an officer's questions where there are no "specific, objective facts establishing reasonable suspicion [of] criminal activity." *Family Serv. Ass'n*, 783 F.3d at 605. "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002). A seizure has not occurred if a reasonable person would feel free to terminate the encounter. *Id*.

According to the facts alleged by Plaintiff, after Bush was arrested and the traffic stop had concluded, Plaintiff asked Defendant if he was under arrest, and was told, "you're coming with me." Dkt. No. 29-2, p. 19 (Pg. ID 582). Viewing the evidence in the light most favorable to the non-moving party, there is a question of fact as to whether a reasonable person would feel free to terminate the encounter. Thus, the Court will not grant summary judgment to Defendant on Plaintiff's search and seizure claim.

## C.    Defendant's Claim of Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity provides government officials "breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (internal citations and quotation marks omitted). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of

-19-

the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted).

To determine whether a police officer is entitled to qualified immunity, the Court applies a two-prong test: "(1) whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right; and (2) whether the right violated was clearly established such 'that a reasonable official would understand that what he is doing violates that right.' " *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (citation omitted). "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.' " *Pearson*, 555 U.S. at 243–44 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)).

Here, when the facts are viewed in the light most favorable to Plaintiff, the allegations support the conclusion that Defendant committed a constitutional violation. Plaintiff testified that he was unlawfully detained, patted down without reasonable suspicion, pulled so aggressively that he slipped on the ice and broke his arm, and then kneed in the buttocks once he climbed in the patrol car. Under Plaintiff's version of the facts, there were several constitutional violations: (1) the illegal seizure when he was held beyond the necessary duration of the traffic stop; (2) the illegal search of Plaintiff's person; and (3) the use of excessive force. The

lone remaining inquiry is whether or not the Defendant violated clearly established law.

At the time of the incident, given the state of Constitutional law, a reasonable officer would have known that it would be a violation of a person's Fourth Amendment right to be free from unreasonable searches to conduct a pat down without either reasonable suspicion—for the frisk—or probable cause—for a search of drugs on Plaintiff's person. It was also clear at the time of the incident that it would be unreasonable to use force on compliant passenger who was not threatening officer safety and was not suspected of a crime. Thus, the question of whether Defendant may be entitled to qualified immunity turns on whether one accepts Plaintiff's or Defendant's version of the facts. Based on the evidence currently before the Court, a genuine issue of fact has been presented as to whether the search occurred without sufficient cause and whether excessive force was utilized. For these reasons, Defendant's claim for qualified immunity will be denied.

## V. CONCLUSION

Accordingly, for the reasons discussed in detail above, the Court **DENIES** Defendant's Motion for Summary Judgment [27].

IT IS SO ORDERED.

Dated:        March 27, 2017

/s/Gershwin A Drain
HON. GERSHWIN A. DRAIN
United States District Court Judge